## Sankey's Appeal.

1. On the return of an inquisition of partition in the Orphans' Court, the judge endorsed the confirmation, and a direction for a rule upon heirs to issue, without fixing a day for its return; the clerk issued the rule and made it returnable to the first day of the next term. This was *fixing* a day for the return of the rule.

2. When the first day of the term was fixed for heirs to appear under a rule to accept or refuse, they were bound to attend before the court as other suitors till they were called.

3. The court directed the rule to be published in two papers; the return showed that it had been published but in one, and the return was approved by the Orphans' Court. *Held*, that as the publication was to the extent required by the act, the approval by the court cured the non-compliance with its order.

May 28th 1867.     Before THOMPSON, READ and AGNEW, JJ. WOODWARD, C. J., and STRONG, J., absent.

Appeal of Samuel Sankey from the decree of the Orphans' Court of *Centre county*, in the matter of the partition of the real estate of John Sankey, deceased.

On the 1st of September 1865 Jacob Sankey presented a petition to the Orphans' Court of Centre county, setting forth that John Sankey, Sr., had died seised of certain real estate, set out in the petition, leaving a widow and a number of children, amongst whom were Jacob, the petitioner, and Samuel Sankey, and praying the court to award an inquest to make partition of the premises amongst the parties interested.

On the petition Judge Linn endorsed the following order:—

"And now, September 1st 1865, petition read and inquest awarded to make partition or valuation of the land within described, lying in Centre county, in accordance with the directions of the will and the laws of this Commonwealth. Personal notice to parties resident in the county of Centre, or by copy left at their place of abode. Notice to parties resident out of said county by publication in one newspaper published in Bellefonte for six successive weeks."

The inquest returned that the land could not be divided so as to accommodate all the heirs, but could be valued separately, so as to accommodate part of them, and therefore divided them into four parts, the first of which was valued at $16,468.75, and the third at $267.31.

At November Term 1865 the court endorsed the following order on the writ:—

"November 27th 1865. *Conf'd nisi*, and a rule is granted on the heirs and devisees to accept or refuse to accept the premises according to law. Notice to parties resident out of the county by publication in two newspapers published in Centre

county for six successive weeks, a copy thereof to be sent by mail to the post-office address of each of them."

The rule as issued was " upon the heirs and representatives of John Sankey, deceased, to come into court on the 4th Monday of January next, and accept or refuse, or show cause, &c."

The sheriff's return to the rule was :—

" And now, December 26th 1865, personally served the within on Jacob Sankey and Mrs. Sankey, widow, by true and attested copy, and on Cyrus Sankey by leaving a true and attested copy at his boarding-house, and on those residing within the county by publication of the within in the " Democratic Watchman," a paper printed in Bellefonte, for six successive weeks, and sent a copy containing same to the post-office address of each."

On the return of the rule the following decree of adjudication was made :—

" And now, to wit, the 25th day of January 1866, due proof of the service of the rule having been made upon the heirs of John Sankey, deceased, to come into court and elect to take or refuse to take, the real estate of the said decedent at the valuation and appraisement made thereof by the jury of inquest, and said proof having been adjudged sufficient, and all the heirs of the said decedent having been called in open court, Jacob Sankey, the eldest son of said decedent, appeared and elected to take all those two certain tracts of land in the first and third places in the return to said writ of inquisition mentioned.    *    *    *

" And no one appearing to offer a higher price for the said real estate than the valuation and appraisement made thereof by the inquest aforesaid, and no one of the said heirs having come into court, either in person or by attorney, to take the same or any other of the real estate mentioned in the said writ of inquisition and the return thereto, whereupon the court order and adjudge the said real estate elected to be taken by the said Jacob Sankey, to him, his heirs and assigns for ever, at the valuation and appraisement thereof made by the inquest as aforesaid."

The 25th of January was the fourth day of the term.   On the 26th of January certain of the heirs of the decedent, not including Samuel Sankey, petitioned the court, setting forth that they resided out of the county of Centre, and had had no notice of the rule upon the heirs to come into court at the present term to elect or refuse the estate, and did not know till the evening of January 25th that it was to be taken at that term ; that Jacob Sankey had represented to them that none of the property would be taken at the valuation, but that it should be sold ; that in consequence of these representations they paid no attention to the matter ; that they believe the property taken by him is worth $1500 more than the appraisement, and they offered that amount in addition to the

valuation; and prayed the court for a rule upon Jacob to show cause why the allotment to him should not be vacated.

Accordingly a rule was granted, to which Jacob answered April 25th 1866, denying the allegations of the petition.

On the same day an agreement was entered into between Jacob and John and Cyrus Sankey, two other heirs, by which it was agreed that the rule on Jacob should be discharged, and that if within six months any of the parties could effect a sale of the land allotted to Jacob at an advance of 10 per cent., Jacob would convey the property to the purchaser, and after discharging Jacob's recognisance and costs, the balance should be divided amongst the heirs; it being understood that the sale should not be made to any of the parties in interest. On the 28th of April the rule on Jacob was discharged.

On the 10th of October 1866, no sale having been effected, Samuel Sankey presented a petition setting forth substantially the same facts as the former petition, and also the agreement for the discharge of the rule against Jacob; and further, " That when the said proceedings in partition were commenced, your petitioner was in San Francisco, California, and had no notice thereof other than a letter from John Sankey, one of the executors, and from C. K. Sankey, and John Reighard, another executor, in which he was informed that the real estate was to be appraised, and by an agreement between all the heirs, as heirs, and the executors, no one of the heirs was to take any part thereof at the appraisement, but that all should be sold, and the proceeds divided among them." *     *     *     *     *     *     *     *

" That the said John Sankey and C. K. Sankey had no authority from any of the other heirs of said estate to make such an agreement; that your petitioner had no notice of any of the proceedings in partition except what is hereinbefore stated; that the real estate allotted to said Jacob Sankey is valued and appraised at a sum, as your petitioner believes, much below the real value; that he has had no opportunity to bid above its appraised value, as the law provides, and as he desired to do and now desires to do, and that great injustice would be done your petitioner, and other heirs of said estate, if the said allotment to said Jacob Sankey were allowed to remain." And prayed for an alias rule on Jacob to show cause why the decree allotting him the real estate of his father should not be vacated. On the same day the rule was awarded.

Jacob answered this rule November 28th 1866, denying its allegations, and averring that for the sake of peace he had entered into the agreement above mentioned; that the heirs had made efforts to get a purchaser for the real estate on the terms mentioned in the agreement, but had not been able to obtain any

offer. Testimony was taken under this rule, and on the 22d of April 1867 it was discharged.

Samuel Sankey appealed, and assigned the following errors: that the court erred—

1. In making the following order confirming the inquisition *nisi*, viz., " November 27th 1865. *Conf'd. nisi*, and rule is granted on the heirs and devisees, to accept or refuse to accept the premises according to law."

2. In not fixing a day certain when the heirs should appear in obedience to the rule to elect or refuse the real estate.

3. In decreeing certain of the real estate of John Sankey, deceased, at the appraised valuation thereof by the inquest, to Jacob Sankey four days after the return day of the rule issued by the clerk on the heirs to come into court and elect or refuse to take.

4. In discharging the *alias* rule on Jacob Sankey to show cause why the decree allotting to him certain portions of the real estate of John Sankey, deceased, should not be vacated and annulled.

5. In not making absolute the *alias* rule on Jacob Sankey to show cause why the decree allotting to him certain portions of the real estate of John Sankey, deceased, should not be vacated and annulled.

*A. Hoy*, for appellant, cited Acts of March 29th 1832, §§ 37, 40, Purd. 293, 294, pl. 129, 133, Pamph. L. 201, § 52, Purd. 765, pl. 15, Pamph. L. 207 ; April 14th 1835, § 2, Purd. 293, pl. 128, Purd. L. 275 ; Road in Norriton Township, 4 Barr 338 ; Shaefferstown Road, 5 Id. 515 ; Road to Ewing's Mill, 8 Casey 284 ; Boyer's Road, 1 Wright 259 ; Wentz's Appeal, 7 Barr 152.

*A. O. Furst* and *J. H. Orvis*, for appellee, cited Act of March 29th 1832, § 52, *supra;* Wentz's Appeal, 9 Barr 152.

The opinion of the court was delivered July 3d 1867, by

AGNEW, J.—The 1st and 2d errors assigned, which may be considered together, are unfounded. The rule made out and issued by the clerk of the Orphans' Court fixed a day certain, " the fourth Monday of January next," to come into court and accept or refuse the premises at the valuation. The objection that no day certain was fixed, according to the 40th section of the Act of 29th March 1832, is founded upon the mere note of the confirmation and order for the rule entered by the court on the back of the inquisition. Had the clerk omitted to carry out the order fully, by fixing a day of appearance, there might be some ground of complaint. The note of the judge is but a minute for the information of the clerk, who afterwards makes up the record in full. It is a common practice in many districts for the judge who has the papers before him for inspection to minute the orders upon

them. The clerks are often not apt or experienced. The clerk then makes up his entry in the docket at full length. It is an error to suppose that the clerk must transcribe the judge's minute, with all the abbreviations and ellipses. The docket entries are not printed for us, but the rule to accept or refuse is, and that fixes a day certain.

The third error complains that the estate was decreed to Jacob Sankey, the eldest son, four days after the return day of the rule. But the rule was returned duly served, all the heirs were called in open court, and no one appeared to accept or to offer a higher price, and the premises were accordingly duly adjudged to Jacob. Monday of the term being fixed, the parties were bound to attend before the court as other suitors do until called. The Common Pleas, Quarter Sessions, Oyer and Terminer, and Orphans' Court, convene at the same time and place before the same judges, and the business of all proceed *pari passu*, except when special days are fixed for special business. The parties being duly notified, must continue in court until called or dismissed. If the business could not be taken up on Monday, it must await till the court is ready to hear it, or dispose of it. The decree of the premises was therefore good on the fourth day.

The 4th and 5th assignments of error involve the same question. The rules taken to show cause why the decree allotting the lands to Jacob Sankey should not be vacated, were applications to the sound discretion of the court to set aside its own act. The exercise of such a discretion is generally not reviewable. But as the ground set forth for obtaining the rules was a want of notice of the partition, we may regard this as the substantial error assigned. The service of the notices appears to be regular and according to the order of the court, except in one particular. The rule to appear, and accept or refuse the premises, was ordered to be published in two newspapers, while the return of service and affidavit is of publication in but one paper. In Ragan's Estate, 7 Watts 438, it was decided that the averment of the record is primâ facie evidence of the service of notice, but not conclusive; and this court set aside the proceedings in partition on an appeal, because it appeared that in fact no notice was given to one of the parties; and this, notwithstanding it was alleged in the petition that he had been advanced his share of the estate in money. We are, therefore, brought to determine whether this irregularity in the service on part of the sheriff, in this case, is fatal upon an appeal. We think it is not. The 52d section of the Act of 29th March, 1832, relating to Orphans' Courts (the same which regulates proceedings in partitions), provides for notice to be given to heirs, legatees or distributees, of any proceedings affecting them in the Orphans' Court. It directs personal notice to parties resident without the county, if the court deem it reasonably practi-

cable, but if not, then "in such one or more newspapers as in the opinion of the court will be most likely to meet the eye of those entitled to notice." The number of newspapers in which publication shall be made is therefore discretionary—it may be one or it may be more. In this case the court went beyond the requirement of the act in ordering a copy of the paper containing the notice to be mailed to the post-office address of each non-resident party ; and the sheriff returned that he had mailed a copy to each. The court having the power to make the original order for publication in one newspaper only, there is no reason why its ratification of the publication in but one, should not be held to be good. The return was of a publication strictly according to law, and we cannot say the court abused its discretion in accepting the return and reducing the number of newspapers, so long as it still continued within the legal limit. A publication in one and mailing a copy were clearly quite as good as a new publication in two. The effect of ratification is well stated by Justice Rogers in Klingensmith v. Bean, 2 Watts 486, in which it was held that confirmation of an administrator's sale of real estate after a term had intervened, was tantamount to a continuance of the order of sale, and ought to be held good even upon an appeal. See also Rham v. North, 2 Yeates 118; and Snyder's Lessee v. Snyder, 6 Binn. 478.

Upon the whole case we discover no fatal error, and the decree of the Orphans' Court is therefore affirmed.